(No. 56124.—

*In re* ARNOLD IRWIN KRAMER, Attorney, Respondent.

*Opinion filed October 22, 1982.*

UNDERWOOD and MORAN, JJ., dissenting.

David Beckerman, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins & Amos, of Chicago, for respondent.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On May 5, 1980, the Administrator of the Attorney Registration and Disciplinary Commission filed a one-count complaint against respondent, Arnold Irwin Kramer, who was licensed to practice law in Illinois on November 28, 1961, charging commingling and conversion of a client's funds. A panel of the Hearing Board recommended that respondent receive the oral and written reprimand of the Commission. The Administrator filed exceptions to the recommendation of the Hearing Board, and the Review Board recommended that respondent be suspended for one year.

The evidence consists of the testimony of respondent and a number of exhibits. Philip Bradbury, the complainant, could not be located and was believed to be living in Mexico.

Respondent testified that he had met Bradbury 30 years earlier when he (respondent), at age 15, was working for his father's bookbinding business. Bradbury and respondent's father were business acquaintances and were both engaged in the bookbinding business. When respondent started his law practice, Bradbury became one of his first clients.

Bradbury became indebted to respondent as a result of a number of transactions. When respondent's father died, respondent inherited his father's bookbinding equipment. Respondent asked Bradbury to sell the equipment for him. Bradbury apparently sold the equipment,

but did not account to respondent for the proceeds of the sale. Respondent had loaned money to Bradbury which had not been fully repaid, and he had not been paid for various legal services.

In March or April of 1978 Bradbury came to respondent's office. He was the contract purchaser of land in Lake County and was having problems paying the installments as they became due. He asked respondent to assist him in selling the property and negotiating an offer or a contract. Initially respondent refused because Bradbury was already heavily indebted to him. Bradbury told respondent that the only way he could pay respondent was if he sold the land, saying, "You'll take the money out of the sale once you get it closed."

Bradbury told respondent that Charles Corder had made several offers to purchase the property. Respondent contacted Corder and negotiated a contract for the sale of the land. Corder delivered to respondent a cashier's check in the amount of $40,000 payable to "Arnold Kramer, Escrowee for Philip Bradbury," as earnest money.

Respondent testified that the land was sold for $300,000, and customarily the amount of earnest money to be placed in escrow would be 10%, or $30,000. Respondent, however, insisted on a $40,000 escrow deposit, because the deposit was to cover the debt Bradbury owed him plus respondent's fees for negotiating the contract and acting as Bradbury's attorney in the sale. Respondent testified that the escrow deposit was his money, subject to some accounting. The parties stipulated that the check was deposited into an account which was used by respondent "for his own purposes." Shortly after the check was deposited the balance in this account fell below $40,000, and several times before the land transaction was closed, the account was overdrawn.

Respondent structured the transaction so that the contract seller, Howerton, conveyed the land to three

land trusts. At the first closing, Bradbury assigned his beneficial interest in the land trusts to Corder upon payment of the first installment of approximately $160,000. As Corder paid the specified sums of money, he was assigned the beneficial interests in the other land trusts.

At the time of the first closing, respondent asked Bradbury to "have an accounting." Bradbury declined, however, and no accounting was made until six months later. Respondent "settled" with Bradbury and issued him a check for $14,160.53, the difference between the $40,000 escrow deposit and the amount Bradbury owed respondent for past debts plus the fees owed for the sale of the property. Bradbury did not at any time negotiate the check. He filed suit against respondent in the United States district court. That action was settled for $26,000.

The hearing panel found:

> "What stands out is this: When a lawyer closes a real estate deal for a client, no matter how many hats the lawyer wears, his duty *as a lawyer* is to put those funds in a trust account and never to disburse them without the *prior* certain approval of a client. Respondent violated this essential rule. He cannot escape his obligations as a lawyer by explaining that he was also a creditor, vendor and negotiator." (Emphasis in original.)

The Review Board concluded:

> "The record clearly and convincingly reflects that Respondent did not preserve the identity of his client's funds in a trust account."

Assuming that, as testified by respondent, he and Bradbury had agreed that he would be paid from the escrow funds, the deposit of those funds in respondent's account, admittedly used "for his own purposes," nevertheless violated Disciplinary Rule 9—102(a), which provides:

> "(a) Other than advances for costs and expenses, all funds of clients paid to a lawyer or law firm, including funds belonging in part to a client and in part presently

> or potentially to the lawyer or law firm, shall be deposited in one or more separate identifiable trust bank accounts maintained in the State in which the law office is situated." (85 Ill. 2d R. 9—102(a).)

Assuming agreement that some portion of the funds was unquestionably due respondent, respondent's failure to segregate the funds in dispute until the dispute was settled violated Disciplinary Rule 9—102(b) (85 Ill. 2d R. 9—102(b)). (See *In re Schlax* (1980), 81 Ill. 2d 66, 70-71.) Moreover, the funds were designated by Corder as escrow funds, and respondent admitted that Corder was unaware of any agreement between Bradbury and respondent as to the ownership of the funds. Respondent argues that since all but the most remote contingencies affecting Corder's ownership of the land were removed, no harm came to Corder by reason of respondent's failure to deposit the escrow money in a trust account. An attorney may not disburse escrow funds when he believes it is safe to do so; an escrowee may disburse escrow funds only in accordance with the terms of the escrow agreement. *Ortman v. Kane* (1945), 389 Ill. 613, 621.

As we have noted, the evidence shows that before the transaction was closed the balance in respondent's account fell below $40,000 and on several occasions the account was overdrawn. Although the evidence would support a finding of conversion (see *In re Freel* (1982), 89 Ill. 2d 263, 269; *In re Clayter* (1980), 78 Ill. 2d 276, 282-83) neither the Hearing Board nor the Review Board found that respondent had converted the funds. Although we find no evidence of intent to convert the funds, we cannot condone the manner in which respondent sought to resolve the problem with his client.

It is not necessary that there be evidence of a dishonest motive in order to impose discipline, but its absence is properly considered in determining the appropriate sanction.

Respondent contends that the facts of this case do not

warrant suspension. We agree. This is similar to *In re Freel,* where only one instance of violation of the Code of Professional Responsibility has been shown and no bad faith or dishonest motive appears from the record. Our primary consideration in determining the nature and extent of discipline to be imposed in any particular case is the protection of the public and the integrity of the profession. (*In re Grant* (1982), 89 Ill. 2d 247, 254; see *In re Nadler* (1982), 91 Ill. 2d 326, 334.) There was no impropriety in respondent's attempting to protect his financial interests; however, because of his status as an attorney involved in the transaction, the method he employed to protect his interests was improper.

The record shows that the complainant attempted to use withdrawal of the complaint in this disciplinary proceeding as a bargaining tool to increase the amount of the settlement of the case which he had filed against respondent in the United States district court. After that case was settled, he apparently lost all interest in the disciplinary proceeding. Some of the facts and circumstances of this case suggest that it is not always the client who is in need of protection.

We conclude that for the violation of Disciplinary Rules 9—102(a) and 9—102(b) shown by this record the appropriate sanction is censure.

*Respondent censured.*

JUSTICE UNDERWOOD, dissenting:

It is undisputed that respondent deposited the $40,000 down payment in his personal checking account upon which both he and his wife could draw checks. That account was, prior to any accounting between respondent and his client, not only reduced below $40,000 but was overdrawn. Respondent defends this action as not improper because, he testified, his client and he had agreed the down payment was to be respondent's, subject to a later accounting, as reimbursement for fees and money

owed him by the client.

While the client was not available to testify, and respondent's testimony was not directly contradicted, the fact that the client subsequently found it necessary to sue him and that respondent settled that suit for approximately double the amount he originally tendered his client seems to indicate the client did not understand the agreement as respondent did.

In my judgment, the hearing panel aptly characterized this situation in its recommendation when it stated:

> "What stands out is this: When a lawyer closes a real estate deal for a client, no matter how many hats the lawyer wears, his duty *as a lawyer* is to put those funds in a trust account and never to disburse them without the *prior* certain approval of a client. Respondent violated this essential rule. He cannot escape his obligation as a lawyer by explaining that he was also a creditor, vendor and negotiator.
>
> His conduct has put our profession in disrepute."

Although neither the hearing nor review board so found, the majority concedes the evidence would support a finding of conversion. There is, in my opinion, no question but that respondent converted his client's money, since the client had not consented to dissipation of the entire $40,000 by respondent without an accounting, and that is exactly what occurred when respondent overdrew the account. The circumstances surrounding a conversion, together with other factors, determine the discipline to be imposed. Obviously the circumstances here are not as aggravating as in some cases, but I do not regard as adequate the reprimand ordered by the hearing panel or the censure ordered by the court. *In re Grant* (1982), 89 Ill. 2d 247; *In re Schlax* (1980), 81 Ill. 2d 66; *In re Brody* (1976), 65 Ill. 2d 152; *In re Bloom* (1968), 39 Ill. 2d 250.

JUSTICE MORAN joins in this dissent.