(No. 61625.—

*In re* LARY GORDON STONE, Attorney, Respondent.

*Opinion filed November 21, 1985.*

James J. Grogan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins & Uscian, of Chicago, for respondent.

JUSTICE RYAN delivered the opinion of the court:

Respondent, Lary Stone, was admitted to practice in this State on May 22, 1962. In April 1984, the Administrator of the Attorney Registration and Disciplinary Commission filed a five-count complaint charging respondent with misconduct tending to bring the legal profession into disrepute. All of the conduct at issue took place between January 1981 and June 1982. The Hearing Board found that respondent neglected to complete two adoption proceedings, failed to deposit client funds into a separate, identifiable trust account, engaged in conduct involving fraud, deceit, and misrepresentation, and failed to carry out a contract of employment to the detriment of his client. Based upon its findings, the Hearing Board recommended respondent be suspended from the practice of law for a period of one year. Respondent filed exceptions with the Review Board, which, after full consideration and review of the record, affirmed the Hearing Board's recommendation. Respondent then filed exceptions in this court pursuant to Rule 753(e)(5) (94 Ill. 2d R. 753(e)(5)).

Count I of the Administrator's complaint concerned respondent's handling of an adoption for Alan and Pamela Witt in May 1981. Uncontradicted testimony showed respondent informed the Witts that the adoption would cost approximately $4,000, including attorney fees of between $750 and $1,000. The Witts agreed to pay respondent's fees plus whatever costs would arise, and he initiated the adoption proceeding on their behalf.

On or about June 9, 1981, Alan Witt issued a check for $4,000 to respondent, who cashed it at a branch of the Witts' bank the same day. Respondent testified that he took the cash, placed it in an envelope, placed the en-

velope either in his pocket or his briefcase, and left the bank. He further testified that either that same day or the next he obtained two cashier's checks from another bank, totaling $1,318. These checks were used to pay pediatrician and obstetrician fees involved in the adoption. The balance of the proceeds of the Witts' check, $2,682, was to be used to pay the baby's hospital bill and respondent's fee. Respondent placed this balance inside the pocket of an old suit in a closet in his apartment.

The night before he and the Witts were to go to the hospital to pick up the baby, respondent discovered that the cash was no longer in his apartment. Respondent testified before the Hearing Board that other items of personal property and the woman he had been living with disappeared on this same evening. Respondent did not report the incident to the police.

The next day respondent went with the Witts to the hospital to pick up the child. Respondent testified that he had guaranteed payment of the hospital bill and that he believed unless it received payment, the hospital would not release the baby. Since he no longer had the cash, respondent issued a personal check to the hospital for $1,921.05 so that the Witts could take custody of the child. Respondent knew that his account contained insufficient funds to cover this check.

Approximately one week later, respondent received notice from his bank that the check would not be honored. Two weeks after issuing it, respondent was informed by the hospital that the check had been returned for insufficient funds. Representatives of the hospital made several unsuccessful attempts to collect the $1,921.05 from the respondent. More than a year later, after the filing of the complaint with the Attorney Registration and Disciplinary Commission concerning his handling of the Witt adoption, respondent paid the hospital the full amount of the bill.

Respondent admitted he never obtained a final decree and that he did not refer the Witt adoption to another attorney for completion. In 1982, without respondent's assistance, the guardian *ad litem* appointed for the child obtained a final decree of adoption for the Witts. The guardian filed charges with the Commission concerning respondent's conduct.

Count II of the complaint concerned respondent's conduct in a second adoption case. The Hearing Board record showed that Ralph and Delores Rivera had adopted a child early in 1980. Early in 1981, they were informed that the natural sibling of their first child had been born and was available for adoption. The Riveras discovered that the social welfare agency that handled their adoption in 1980 refused to cooperate in a second adoption. They then retained respondent to secure the adoption of the sibling.

After the Riveras paid respondent $1,492 to cover costs and his attorney fees, respondent filed the adoption petition and successfully arranged for the adoption of the child. He submitted a final decree of adoption but was informed that the identity of the child's putative father had been discovered. The judge ordered respondent to republish notice of the adoption proceeding including the name of the putative father. Respondent republished the notice but took no further action to complete the adoption.

The Riveras made repeated but unsuccessful attempts to contact respondent to inquire about the status of the adoption. Eventually, they retained another attorney who completed the adoption for them. As a result, the Riveras incurred additional costs and lawyers' fees. The Riveras' second counsel filed charges with the Attorney Registration and Disciplinary Commission concerning respondent's handling of the Riveras' case on June 15, 1982. After the complaint was filed, respondent reimbursed the Riveras for their extra costs and fees.

Counts III and IV of the complaint involved respondent's issuance of two paychecks to Mary Martin, his secretary. Count III concerned a check issued on April 3, 1981, and count IV concerned Martin's paycheck of April 14, 1981. At the time in question, respondent had only one checking account which he used for both business and personal expenses. It was his practice to compensate his secretary by check every two weeks.

Testimony before the Hearing Board showed that prior to April 1981 respondent had borrowed $5,000 from his bank using stock certificates as collateral. On March 28, 1981, respondent received a telegram asking him to contact the executive vice-president of the bank immediately in regards to his checking account. He met with the bank official within the ensuing week and was informed that the collateral the bank held was insufficient to cover the loan. Respondent was given one day to provide additional collateral. When he was unable to provide any additional security, the bank froze the funds in this checking account. As a result, neither of the two checks written to Martin was honored.

After numerous attempts to contact respondent by telephone, Martin retained an attorney to assist in the collection of the amount due her. In late May 1981, Martin filed a complaint against respondent with the Attorney Registration and Disciplinary Commission. On June 1, 1982, respondent paid Martin $701.25 and obtained a release from all liability arising from the issuance of the two checks.

Count V of the Administrator's complaint concerned respondent's reply to the charges filed by Mary Martin. A copy of the charge was forwarded to him for a written reply. In a letter dated September 17, 1981, respondent explained that Martin's paychecks had not been honored because his checking account had been frozen by the bank. He went on to say that "the matter has been rec-

tified and that account is now in good order." Respondent knew at the time he wrote the letter that the account in question had been closed in August 1981.

The Hearing Board concluded that respondent's conduct in failing to complete both the Witt and Rivera adoptions constituted neglect of a legal matter entrusted to him in violation of Rule 6—101(a)(3) of the Code of Professional Responsibility (87 Ill. 2d R. 6—101(a)(3)).

In regard to the Witt adoption, the Hearing Board concluded that while respondent did not act with an evil motive to convert the funds, he violated Rule 9—102(a) of the Code by failing to deposit the proceeds of the Witts' check in a trust bank account (87 Ill. 2d R. 9—102(a)). It was further concluded that respondent's issuance of the check to the hospital was conduct involving fraud, deceit, misrepresentation and moral turpitude in violation of Rule 1—102(a) (87 Ill. 2d R. 1—102(a)). In regard to the Rivera adoption, the Hearing Board concluded that respondent's failure to complete the adoption was conduct prejudicial to the administration of justice in violation of Rule 1—102(a)(5), that he failed to carry out a contract of employment in violation of Rule 7—101(a)(2), and that his clients were thereby damaged in violation of Rule 7—101(a)(3) of the Code of Professional Responsibility. (87 Ill. 2d Rules 7—101(a)(2), 7—101(a)(3), 1—102(a)(5).) The Board also concluded that respondent knew or should have known that his checking account was frozen at the time that he issued the checks involved in counts III and IV, and that therefore his action constituted conduct involving dishonesty, fraud, deceit and misrepresentation, and conduct involving moral turpitude in violation of Rules 1—102(a)(3) and (a)(4). (87 Ill. 2d Rules 1—102(a)(3), 1—102(a)(4).) Finally, the Hearing Board concluded that the Administrator had failed to prove by clear and convincing evidence that respondent's conduct in responding to the Commission's inquiry constituted a violation of the Code of Pro-

fessional Responsibility.

We concur with the Hearing Board's findings of facts and conclusions as to the violations embodied in respondent's conduct.

There is only one issue presented by the facts in this case: What is the proper sanction prescribed for respondent's misconduct? Based on its findings, the Hearing Board recommended suspension from the practice of law for a period of one year. The Review Board affirmed this recommendation, and the Administrator urges that we accept and confirm the suspension. Respondent argues that censure would be a more appropriate sanction.

In determining the proper sanction we should strive to prescribe similar sanctions for similar types of attorney misconduct. (*In re Enstrom* (1984), 104 Ill. 2d 410; *In re Woldman* (1983), 98 Ill. 2d 248.) However, we must also recognize that sanctions must be prescribed in light of the unique facts in each case. *In re Crisel* (1984), 101 Ill. 2d 332; *In re Feldman* (1982), 89 Ill. 2d 7.

Although there appear to be no cases whose facts are identical with those presented here, there are prior cases analogous to respondent's various acts of misconduct.

The legal profession's high standards "impose upon an attorney the duty to represent a client with zeal and diligence ***." (*In re Chapman* (1978), 69 Ill. 2d 494, 501.) An attorney's failure to exercise reasonable diligence in the pursuit of a legal matter entrusted to him may constitute misconduct sufficient to warrant disciplinary action. (See, *e.g., In re Chapman* (1983), 95 Ill. 2d 484; *In re Levin* (1984), 101 Ill. 2d 535, *cert. denied* (1984), 469 U.S. 933, 83 L. Ed. 2d 267, 105 S. Ct. 331; *In re Kink* (1982), 92 Ill. 2d 293.) This court has found suspension to be an appropriate sanction for an attorney's neglect where a corrupt motive and moral turpitude have not been involved (see, *e.g., In re Johnson* (1982), 93 Ill. 2d 441; *In re Levinson* (1978), 71 Ill. 2d

486; *In re Taylor* (1977), 66 Ill. 2d 567; *In re Ahern* (1961), 23 Ill. 2d 69', even when only one instance of neglect was shown (*In re Levin* (1979), 77 Ill. 2d 205).

In the present case, respondent simply did not obtain final decrees in either the Witt or the Rivera adoption, even though he admitted that the preparation of the final decree was not a major legal undertaking and that there was no question he should have done so. This case presents facts not unlike *In re Levinson* (1978), 71 Ill. 2d 486, in which the attorney neglected to complete an adoption and to carry out a contract of employment. This court found that the attorney's conduct in that case warranted a suspension from the practice of law for six months. 71 Ill. 2d 486, 493.

Respondent argues that his case is analogous to *In re Ambrose* (1982), 93 Ill. 2d 42, in which the attorney was only reprimanded for failing to present a divorce decree for final court action. We disagree. In *Ambrose*, the attorney was never paid to undertake the divorce, and the Hearing Board characterized his failure as "understandable." (93 Ill. 2d 42, 45-46.) No such finding was or could be made in the present case.

Nor can we accept respondent's view that the imposition of censure in *In re Winn* (1984), 103 Ill. 2d 334, calls for a similar sanction here. In *Winn*, the attorney neglected to file a cause of action until after the relevant statute of limitations had run. (103 Ill. 2d 334, 336.) This court noted as a mitigating factor that the client in *Winn* had "refused to authorize filing suit until shortly before the end of the limitations period." (103 Ill. 2d 334, 338.) In the present case, there is no evidence that either the Witts or the Riveras contributed in any way to respondent's failure to complete their respective adoptions.

Also involved in this case is respondent's violation of Rule 9—102(a) of the Code of Professional Responsibility, which in part provides:

"(a) Other than advances for costs and expenses, all funds of clients paid to a lawyer *** shall be deposited in one or more separate identifiable trust bank accounts ***." (87 Ill. 2d R. 9—102(a).)

Respondent's covert method of handling the funds in question did not comply with this rule. Technically, perhaps, respondent's conduct did not constitute a commingling of the funds, but this rule was "intended to guard not only against the actual loss of the funds but also against the risk of loss. (*In re Bizar* (1983), 97 Ill. 2d 127, 132.)" *In re Enstrom* (1984), 104 Ill. 2d 410, 417.

Due to the danger of conversion, it is essential that a client's money "be held in such a manner that there can be no doubt that the attorney is holding it only for another and that the money does not belong to him personally." (*In re Clayter* (1980), 78 Ill. 2d 276, 281.) This court has recognized that " 'a covert method of handling a client's funds is highly unprofessional and *** can only create suspicion and harmful inference.' " (*In re Clayter* (1980), 78 Ill. 2d 276, 282, quoting *In re Lingle* (1963), 27 Ill. 2d 459, 463-64.) In both *Lingle* and *Clayter*, this court was criticizing the depositing of client funds in an attorney's safety deposit box. (27 Ill. 2d 459, 462; 78 Ill. 2d 276, 279-80.) Respondent utilized an even less secure and a more covert means of handling the proceeds of the Witts' check.

Sanctions for the violation of Rule 9—102(a) have varied greatly. Where the attorney's handling of client funds demonstrated a total lack of fitness for the practice of law, disbarment was approved. (*In re Lingle* (1963), 27 Ill. 2d 459.) Where the only charge against the attorney was his mishandling of client funds and it was determined that no evil motive was involved, censure was deemed appropriate. (*In re Clayter* (1980), 78 Ill. 2d 276.) Suspension was imposed in *In re Green* (1984), 104 Ill. 2d 65, where the attorney prejudiced his clients by

failing to preserve the identity of their funds.

One of the recognized purposes of a disciplinary proceeding is the maintenance of the legal profession's integrity. (*In re Smith* (1976), 63 Ill. 2d 250, 256.) The extreme laxity with which the respondent handled these funds indicates that a sanction more severe than censure is called for to serve this purpose.

We do not agree with respondent's contention that the imposition of censure in *In re Enstrom* (1984), 104 Ill. 2d 410, requires a similar result here. In *Enstrom*, the attorney placed client funds in a personal bank account that was levied on by the Internal Revenue Service. The attorney had placed the funds in his own account because his firm had recently disbanded. In contrast to respondent's case, the mishandling of the funds was the attorney's only incident of misconduct. 104 Ill. 2d 410.

By issuing checks to the hospital and Mary Martin which he knew or should have known would not be honored, respondent committed an act of misconduct sufficient to warrant suspension from the practice of law. In *In re Abbamonto* (1960), 19 Ill. 2d 93, the attorney issued two personal checks which were returned for insufficient funds. One was issued in a business capacity and the other was issued to a fellow attorney during a settlement negotiation. Restitution was made after disciplinary proceedings were instituted against the attorney. This court noted:

> "It is not necessary that the acts for which an attorney is subject to discipline be performed in the discharge of professional duties. Misconduct sufficient to warrant suspension or disbarment may be shown by acts not occurring in the course of his professional duties but in a private or business capacity. [Citation.] *** It is vital to the well-being of society that an attorney, who is an officer of the court and a part of our judicial system, should maintain

the most scrupulous care in conducting his professional and business affairs. [Citation.]" (19 Ill. 2d 93, 97-98.)

The court suspended the attorney for five years.

The cases cited by respondent do not support his position that a sanction less than suspension should be imposed. *In re Crisel* (1984), 101 Ill. 2d 332, dealt with an attorney's falsification of a police report. *In re Lamberis* (1982), 93 Ill. 2d 222, concerned the proper sanction for plagiarism in a law school setting. *In re Hopper* (1981), 85 Ill. 2d 318, involved an attorney who failed to file an Illinois income tax return in two consecutive years. These situations, while admittedly involving attorney fraud, deceit, or misrepresentation, do not present relevant guidelines for prescribing a sanction for the multiple infractions in our case.

Several mitigating factors do exist in the present case. Respondent was admitted to practice in 1962 and his first disciplinary problem arose in 1981. This court has often recognized long periods of untainted practice as a mitigating factor in disciplinary proceedings. (See, e.g., *In re Kutner* (1979), 78 Ill. 2d 157, 166; *In re Sherman* (1975), 60 Ill. 2d 590, 593.) Additionally, respondent did not act with an evil motive in regard to the funds that disappeared. This factor has also been held to be relevant in the determination of a proper sanction. (See, e.g., *In re Enstrom* (1984), 104 Ill. 2d 410, 418; *In re Driscoll* (1981), 85 Ill. 2d 312, 315-17; *In re Clayter* (1980), 78 Ill. 2d 276, 283.) Finally, respondent has paid the hospital bill and reimbursed the Riveras for the extra costs and fees they incurred. We may consider this fact in determining the appropriate length of any suspension prescribed for respondent. *In re Bizar* (1983), 97 Ill. 2d 127, 132.

Respondent has argued throughout this proceeding that his misconduct was the result of a temporary psychiatric and medical problem and that this should be con-

sidered in determining an appropriate sanction. We do not agree that the record shows respondent was suffering from a "psychiatric factor" sufficient to serve as a material mitigating circumstance. It is not disputed that respondent does suffer from a congenital physical condition, and during 1981 he was taking medication. Although these factors are not entitled to substantial mitigation weight, we have, nonetheless, given them due consideration. Otherwise, the sanction we here impose would be more severe.

Taken together, respondent's acts of misconduct indicate suspension is the appropriate sanction in his case. Fixing the length of the suspension is always difficult. We are aware of the harm that suspension does an attorney. It involves the loss of clients, the loss of income, and the loss of the respect of courts and of fellow attorneys. (*In re Donaghy* (1948), 402 Ill. 120, 123-24.) We recognize that the "purpose of a disciplinary proceeding *** is to safeguard the public, maintain the integrity of the legal profession and to protect the administration of justice from reproach. [Citation.]" (*In re Smith* (1976), 63 Ill. 2d 250, 256.) In this case, both the Hearing Board and Review Board recommended that respondent be suspended for one year. "Although the recommendation of the boards are given consideration, the responsibility for selecting an appropriate sanction rests with this court. [Citations.]" *In re Winn* (1984), 103 Ill. 2d 334, 337.

In light of the nature of respondent's various acts of misconduct, the sanctions imposed for similar acts, the mitigating factors present, and the purpose which this sanction is to accomplish, we suspend respondent for six months.

*Respondent suspended.*